Markman, J.
In this case, plaintiff, Denise Bryant, personal representative of the estate of her deceased aunt, Catherine Hunt, alleges that defendant Oakpointe Villa Nursing Centre, Inc. (Oakpointe), is liable for the death of her aunt, who died from positional asphyxiation while in defendant’s care. Plaintiff has alleged that defendant was negligent in four distinct ways: (1) by failing to provide “an accident-free environment” for her aunt; (2) by failing to train its Certified Evaluated Nursing Assistants (CENAs) to recognize and counter the risk of positional asphyxiation posed by bed rails; (3) by failing to take adequate corrective measures after finding Ms. Hunt entangled in her bedding on the day before her asphyxiation; and (4) by failing to inspect plaintiffs bed arrangements to ensure “that the risk of positional asphyxia did not exist for plaintiffs decedent.” We are required in this appeal to determine whether each claim sounds in medical malpractice or ordinary negligence.
Plaintiffs “accident-free environment” claim is one of strict liability; because medical malpractice requires proof of negligence, this claim is not legally cognizable. Moreover, under the standards set forth in Dorris v Detroit Osteopathic Hosp Corp, 460 Mich 26; 594 NW2d 455 (1999), plaintiffs failure-to-train and failure-to-inspect claims sound in medical malpractice. Plaintiffs claim that defendant failed to take action after its employees found Ms. Hunt entangled in her bedding on the day before her asphyxiation, however, sounds in ordinary negligence.
We reverse the judgment of the Court of Appeals and remand this case to the Wayne Circuit Court for proceedings on plaintiffs claim of ordinary negligence and, *415 given the equities in this case, on her two medical malpractice claims as well.
I. BACKGROUND
Plaintiffs decedent, Catherine Hunt, was a resident of Oakpointe. She suffered from multi-infarct dementia[1] and diabetes, had suffered several strokes, and required twenty-four-hour-a-day care for all her needs, including locomotion, dressing, eating, toileting, and bathing. Hunt’s condition impaired her judgment and reasoning ability and, in turn, caused cerebral atrophy. Hunt had no control over her locomotive skills and was prone to sliding about uncontrollably and, therefore, she was at risk for suffocation by “positional asphyxia.”[2]
Because Hunt had no control over her locomotive skills, Dr. Donald Dreyfuss, defendant’s medical director, authorized the use of various physical restraints. These included bed rails to keep Hunt from sliding out *416 of the bed, as well as a restraining vest that kept her from moving her arms, thereby impeding her ability to slide. The authorized restraints also included wedges or bumper pads that were placed on the outer edge of the mattress to keep her from hurting herself by striking, or entangling herself in, the rails. The use of restraints of this sort is regulated by the state of Michigan to prevent overuse and excessive patient confinement, and must be authorized by a physician.[3]
Several persons cared for Hunt on a twenty-four-hour basis, including registered nurses, practical nurses, and nursing assistants (CENAs). On March 1, 1997, nursing assistants Monee Olds and Valerie Roundtree noticed that Hunt was lying in her bed very close to the bed rails and was tangled in her restraining vest, gown, and bed sheets. They untangled her from her vest and gown and attempted to position bed wedges onto decedent’s bed to prevent her from slipping into a gap that existed between the mattress and bed rail. The nursing assistants testified that they informed their supervisor that the wedges were not sticking properly and kept falling off, and that better care should be taken in that regard for all patients or else the patients could hurt or even fatally injure themselves.[4]
*417 The next day, March 2, 1997, Hunt slipped between the rails of her bed and was in large part out of the bed with the lower half of her body on the floor but her head and neck under the bed side rail and her neck wedged in the gap between the rail and the mattress, thus preventing her from breathing. When Hunt was extricated, she was transported to a hospital. There was no recovery and, on March 4, 1997, she was taken off life support and died. The cause of her death was listed as positional asphyxia.
Plaintiff filed a suit alleging ordinary negligence against defendant in the Wayne Circuit Court in April 1998. In May 1998, defendant moved for summary disposition pursuant to MCR 2.116(C)(4) and (C)(8), on the basis that plaintiffs claims sounded in medical malpractice rather than ordinary negligence. In August 1998, Judge Pamela Harwood ruled that plaintiffs complaint sounded in ordinary negligence and allowed the case to proceed. In January 1999, Judge Harwood recused herself from the case and it was reassigned to Judge John Murphy.
In June 1999, plaintiff filed a first amended complaint still alleging ordinary negligence. It contained three counts. These were, first, ordinary negligence “by and through” defendant’s employees generally; second, negligent infliction of emotional distress; and third, gross negligence by defendant’s employees generally. Plaintiffs “ordinary negligence” count — the claim at issue in this appeal — contained four distinct claims against defendant:
(a) Negligently and recklessly failing to assure that plaintiffs decedent was provided with an accident-free environment;
(b) Negligently and recklessly failing to train CENAs to assess the risk of positional asphyxia by plaintiffs decedent *418 despite having received specific warnings by the United States Food and Drug Administration about the dangers of death caused by positional asphyxia in bed rails;
(c) Negligently and recklessly failing to take steps to protect plaintiffs decedent when she was, in fact, discovered on March 1 entangled between the bed rails and the mattress;
(d) Negligently and recklessly failing to inspect the beds, bed frames and mattresses to assure that the risk of positional asphyxia did not exist for plaintiffs decedent.
In October 1999, defendant again moved for summary disposition on the basis that plaintiffs new claims of ordinary negligence, in fact, sounded in medical malpractice. Unlike Judge Harwood, Judge Murphy, in June 2000, agreed with defendant and ruled that plaintiffs “ordinary negligence” count sounded in medical malpractice.[5] In addition, he ruled that, although ordinary negligence claims could be brought against the nursing assistants individually, these claims had not properly been pleaded. The court therefore dismissed the complaint in its entirety without prejudice.
Plaintiff appealed the dismissal to the Court of Appeals. Meanwhile, however, seeking to comply with Judge Murphy’s decision, plaintiff, in August 2000, filed a notice of intent to sue in medical malpractice pursuant to MCL 600.2912b and, in February 2001, refiled her case, filing a second amended complaint alleging medical malpractice. Defendant again brought a motion to dismiss pursuant to 2.116(C)(7), on the basis that the two-year medical malpractice period of limitations had expired. Judge Murphy, in June 2001, disagreed and held that the period of limitations was tolled when Judge Harwood issued her August 1998 decision until that *419 decision was reversed by himself in June 2000. Defendant appealed this decision to the Court of Appeals.
The Court of Appeals consolidated plaintiffs appeal from Judge Murphy’s June 2000 decision with defendant’s appeal from his June 2001 decision. The Court of Appeals held in plaintiffs favor, finding that the case sounded in ordinary negligence.[6] The Court recognized that, having so held, the issue regarding the tolling of the period of limitations was moot. However, the Court concluded, in dictum, that if plaintiffs claim had sounded in medical malpractice, Scarsella v Pollak, 461 Mich 547; 607 NW2d 711 (2000), would require its dismissal with prejudice. Defendant appealed the Court of Appeals decision that plaintiffs case sounded in ordinary negligence, and we granted leave to appeal in this case and in Lawrence v Battle Creek Health Systems, 468 Mich 944 (2003), ordering that the two cases be argued and submitted together.[7]
II. STANDARD OF REVIEW
In determining whether the nature of a claim is ordinary negligence or medical malpractice, as well as whether such claim is barred because of the statute of limitations, a court does so under MCR 2.116(C)(7). We review such claims de novo. Fane v Detroit Library Comm, 465 Mich 68, 74; 631 NW2d 678 (2001). In making a decision under MCR 2.116(C)(7), we consider all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict it. Fane, supra; see also MCR 2.116(G)(5)-(6).
*420 III. MEDICAL MALPRACTICE VS. ORDINARY NEGLIGENCE
The first issue in any purported medical malpractice case concerns whether it is being brought against someone who, or an entity that, is capable of malpractice. In addressing this issue, defendant argues that, because MCL 600.5838a refers to “the medical malpractice of. . . an employee or agent of a licensed health facility or agency who is engaging in or otherwise assisting in medical care and treatment,” plaintiffs claim sounds in medical malpractice for the simple reason that it alleges negligence committed by an employee of a licensed health care facility who was engaging in medical care and treatment. In response, we point out that MCL 600.5838a(l) is an accrual statute that indicates when a medical malpractice cause of action accrues. Additionally, as we noted in Adkins v Annapolis Hosp, 420 Mich 87, 94-95; 360 NW2d 150 (1984), this statute likewise expands the traditional common-law list of those who are subject to medical malpractice actions.[8] However, we caution that, although § 5838a expands the category of who may be *421 subject to a medical malpractice action, it does not define what constitutes a medical malpractice action.[9] The fact that an employee of a licensed health care facility was engaging in medical care at the time the alleged negligence occurred means that the plaintiffs claim may possibly sound in medical malpractice; it does not mean that the plaintiffs claim certainly sounds in medical malpractice.
*422 The second issue concerns whether the alleged claim sounds in medical malpractice. A medical malpractice claim is distinguished by two defining characteristics. First, medical malpractice can occur only “ ‘within the course of a professional relationship.’ ” Dorris, supra at 45 (citation omitted). Second, claims of medical malpractice necessarily “raise questions involving medical judgment.” Id. at 46. Claims of ordinary negligence, by contrast, “raise issues that are within the common knowledge and experience of the [fact-finder].” Id. Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions.
In considering whether there has been a professional relationship between the plaintiff and the defendant, Dorris is central to our analysis. In that case, this Court held: “ ‘The key to a medical malpractice claim is whether it is alleged that the negligence occurred within the course of a professional relationship.’ ” Id. at 45, quoting Bronson v Sisters of Mercy Health Corp, 175 Mich App 647, 652; 438 NW2d 276 (1989). A professional relationship sufficient to support a claim of medical malpractice exists in those cases in which a licensed health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care services to the plaintiff. See Dyer v Trachtman, 470 *423 Mich 45; 679 NW2d 311 (2004);[10] Delahunt v Finton, 244 Mich 226, 230; 221 NW 168 (1928) (“Malpractice, in its ordinary sense, is the negligent performance by a physician or surgeon of the duties devolved and incumbent upon him on account of his contractual relations with his patient.”);[11] see also Hill v Kokosky, 186 Mich App 300, 302-303; 463 NW2d 265 (1990); Oja v Kin, 229 Mich App 184, 187; 581 NW2d 739 (1998).
After ascertaining that the professional relationship test is met, the next step is determining whether the claim raises questions of medical judgment requiring expert testimony or, on the other hand, whether it alleges facts within the realm of a jury’s common knowledge and experience. If the reasonableness of the health care professionals’ action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence. If, on the other hand, the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved. As we stated in Dorris:
The determination whether a claim will be held to the standards of proof and procedural requirements of a medi *424 cal malpractice claim as opposed to an ordinary negligence claim depends on whether the facts allegedly raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment. [Dorris, supra at 46, citing Wilson v Stilwill, 411 Mich 587, 611; 309 NW2d 898 (1981).]
Contributing to an understanding of what constitutes a “medical judgment” is Adkins v Annapolis Hosp, 116 Mich App 558; 323 NW2d 482 (1982), in which the Court of Appeals held:
[M]edical malpractice . .. has been defined as the failure of a member of the medical profession, employed to treat a case professionally, to fulfill the duty to exercise that degree of skill, care and diligence exercised by members of the same profession, practicing in the same or similar locality, in light of the present state of medical science. [Citation omitted.]
IV ANALYSIS OF ALLEGATIONS
We now turn to the complaint in the present case.[12] Plaintiff alleges that defendant is liable for: (1) negligently failing to assure that plaintiffs decedent was provided with an accident-free environment; (2) negligently failing to inspect the bed, bed frame, and mattress to assure the plaintiffs decedent was not at risk of suffocation; (3) negligently failing to properly train its CENAs regarding the risk to decedent of positional asphyxiation posed by the bed rails; and (4) negligently failing to take steps to protect decedent from further harm or injury after discovering her entangled between her bed rail and mattress on March *425 1. We address the application of Dorris to each of these claims below.[13]
A. PROFESSIONAL relationship
The first question in determining whether these claims sound in ordinary negligence or medical malpractice is whether there was a professional relationship between the allegedly negligent party and the injured party. This analysis is fairly straightforward and, in this case, is identical for each of plaintiffs claims. Because defendant, Oakpointe Villa Nursing Centre, Inc., a licensed health care facility, was under a contractual duty requiring both it and its employees to render professional health care services to plaintiffs decedent, a professional relationship existed to support a claim for medical malpractice.
B. MEDICAL JUDGMENT VS. LAY KNOWLEDGE
The second question is whether the acts of negligence alleged “raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment.” Dorris, supra at 46.
1. “ACCIDENT-FREE ENVIRONMENT”
Plaintiffs first claim is that defendant “fail[ed] to assure that plaintiffs decedent was provided with an accident-free environment.” This is an assertion of strict liability that is not cognizable in either ordinary negligence or medical malpractice. With reference to *426 ordinary negligence, the test is whether the defendant breached a duty that proximately caused an injury to the plaintiff. See, e.g., Haliw v Sterling Hts, 464 Mich 297, 309-310; 627 NW2d 581 (2001). With reference to medical malpractice law, the Legislature has directed in MCL 600.2912a et seq., that negligence is the standard. Thus, strict liability is inapplicable to either ordinary negligence or medical malpractice. As a result, because this claim is unrecognized in this area of our law, this allegation states no claim at all.
2. FAILURE TO TRAIN
Next, we must determine whether plaintiffs claim that defendant failed to train its staff “to assess the risk of potential asphyxia” is one that requires expert testimony on medical issues. In Dorris at 47, we stated that the plaintiffs allegations “concerning staffing decisions and patient monitoring involve questions of professional medical management and are not issues of ordinary negligence that can be judged by the common knowledge and experience of a jury.” That is not to say, however, that all cases concerning failure to train health care employees in the proper monitoring of patients are claims that sound in medical malpractice. The pertinent question remains whether the alleged facts raise questions of medical judgment or questions that are within the common knowledge and experience of the jury. Id. at 46.
In Dorris, the staff training and patient monitoring issue sounded in medical malpractice because “[t]he ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in apsychiatric ward.” Id. at 47 (emphasis added). That is, knowing how to correctly monitor psychiatric patients requires a specialized knowledge of the complex diseases of the mind that may affect psychiatric pa *427 tients and how those diseases may influence their behavior, and such knowledge is simply not within the realm of “common knowledge.”
Similarly, in order to assess the risk of positional asphyxiation posed by bed railings, specialized knowledge is generally required, as was notably shown by the deposition testimony of plaintiffs own expert, Dr. Steven Miles. Dr. Miles testified that hospitals may employ a number of different bed rails depending on the needs of a particular patient.[14] Accordingly, the assessment of whether a bed rail creates a risk of entrapment for a patient requires knowledge of that patient’s medical history and behavior.[15] It is this particularized knowledge, according to Dr. Miles, that should prompt a treating facility to use the bedding arrangement that best suits a patient’s “individualized treatment plan,” and to properly train its employees to recognize any risks inherent in that bedding arrangement and to adequately monitor patients to minimize those risks.
In describing the appropriate arrangement for plaintiffs decedent, Dr. Miles testified:
This patient had a long history of slide and fall-type injuries, and her entire environment should have been adjusted as part of the individualized treatment plan for this.
*428 And furthermore, the facility had a general obligation to all of its patients, including Ms. Hunt, to provide beds that did not prevent — present a space that was large enough for an entrapment asphyxiation. And they should have been particularly aggressive in using that type of equipment for Ms. Hunt.
This testimony demonstrates that the ability to assess the risk of positional asphyxia and, thus, the training of employees to properly assess that risk, involves the exercise of professional judgment. The picture necessarily gets more complicated when one considers additional restraint mechanisms used in tandem with bed railing such as vests or pelvic restraints to promote the safety of patients.
Indeed, an article in the Journal of the American Geriatrics Society coauthored by plaintiffs expert, Dr. Miles, stresses the need for “clinical and ergonomic changes” in the use of bed rails and decries the widespread use of bed railings “without... a clear sense of their role in a treatment plan and without regulatory attention to their design.”[16] This article concludes with a call for nursing homes to limit the use of bedrails, but notes that research into the relative costs and benefits of using bedrails is “needed urgently.”[17]
This much is clear: in order to determine whether defendant adequately trained its CENAs to recognize the risks posed by particular configurations of bed rails and other prescribed restraint systems, therefore, the fact-finder will generally require expert testimony on what specialists in the use of these systems currently know about their risks and on how much of this knowledge defendant ought to have conveyed to its staff.
*429 Given the patent need in this case for expert testimony regarding plaintiffs claim of failure to train, we conclude that this claim sounds in medical malpractice under Dorris.
3. FAILURE TO INSPECT
Next, plaintiff alleges that defendant is liable for “[n]egligently and recklessly failing to inspect the beds, bed frames and mattress to assure that the risk of positional asphyxia did not exist for plaintiffs decedent.” It is clear from the record in this case that plaintiffs “failure to inspect” claim is not that defendant and its agents actually failed to check Ms. Hunt’s bedding arrangements,[18] but that defendant failed to recognize that her bedding arrangements posed a risk of asphyxiation.
As shown above, and as demonstrated through the deposition testimony of plaintiffs expert, the risk of asphyxiation posed by a bedding arrangement varies from patient to patient. The restraining mechanisms appropriate for a given patient depend upon that patient’s medical history. Thus, restraints such as bed railings are, in the terminology of plaintiffs expert physician, part of a patient’s “individualized treatment plan.”
The risk assessment at issue in this claim, in our judgment, is beyond the ken of common knowledge, because such an assessment require understanding and consideration of the risks and benefits of using and maintaining a particular set of restraints in light of a patient’s medical history and treatment goals. In order *430 to determine then whether defendant has been negligent in assessing the risk posed by Hunt’s bedding arrangement, the fact-finder must rely on expert testimony. This claim, like the claim described above, sounds in medical malpractice.
4. FAILURE TO TAKE STEPS
We turn, finally, to a claim fundamentally unlike those discussed previously. Plaintiff alleges that defendant “[negligently and recklessly fail[ed] to take steps to protect plaintiffs decedent when she was, in fact, discovered on March 1 [1997] entangled between the bed rails and the mattress.”
This claim refers to an incident on March 1, 1997— the day before Ms. Hunt was asphyxiated — when two of defendant’s CENAs found Ms. Hunt tangled in her bedding and dangerously close to asphyxiating herself in the bed rails. According to the CENAs, they moved Ms. Hunt away from the rail and informed their supervising nurses that Ms. Hunt was at risk of asphyxiation.
Plaintiff now contends, therefore, that defendant had notice of the risk of asphyxiation through the knowledge of its agents and, despite this knowledge of the problem, defendant did nothing to rectify it. It bears repeating that plaintiffs allegation in this claim is not that defendant took inappropriate steps in dealing with the patient’s compulsive sliding problem or that defendant’s agents were negligent in creating the hazard in the first place. Instead, plaintiff claims that defendant knew of the hazard that led to her death and did nothing about it.
This claim sounds in ordinary negligence. No expert testimony is necessary to determine whether defendant’s employees should have taken some sort of cor *431 rective action to prevent future harm after learning of the hazard. The fact-finder can rely on common knowledge and experience in determining whether defendant ought to have made an attempt to reduce a known risk of imminent harm to one of its charges.
Suppose, for example, that two CENAs employed by defendant discovered that a resident had slid underwater while taking a bath. Realizing that the resident might drown, the CENAs lift him above the water. They recognize that the resident’s medical condition is such that he is likely to slide underwater again and, accordingly, they notify a supervising nurse of the problem. The nurse, then, does nothing at all to rectify the problem, and the resident drowns while taking a bath the next day.
If a party alleges in a lawsuit that the nursing home was negligent in allowing the decedent to take a bath under conditions known to be hazardous, the Dorris standard would dictate that the claim sounds in ordinary negligence. No expert testimony is necessary to show that the defendant acted negligently by failing to take any corrective action after learning of the problem. A fact-finder relying only on common knowledge and experience can readily determine whether the defendant’s response was sufficient.
Similarly, no expert testimony is required here in order to determine whether defendant was negligent in failing to respond after its agents noticed that Ms. Hunt was at risk of asphyxiation. Professional judgment might be implicated if plaintiff alleged that defendant responded inadequately, but, given the substance of plaintiffs allegation in this case, the fact-finder need only determine whether any corrective action to reduce the risk of recurrence was taken after defendant’s agents noticed that Ms. Hunt was in peril. Thus, *432 plaintiff has stated a claim of ordinary negligence under the standards articulated in Dorris.
V STATUTE OF LIMITATIONS
Having decided that two of plaintiffs claims sound in medical malpractice, we must determine whether plaintiffs medical malpractice claims are now time-barred. See MCR 2.116(C)(7).
The period of limitations for a medical malpractice action is ordinarily two years. MCL 600.5805(6). According to MCL 600.5852, plaintiff had two years from the date she was issued letters of authority as personal representative of Hunt’s estate to file a medical malpractice complaint. Because the letters of authority were issued to plaintiff on January 20, 1998, the medical malpractice action had to be filed by January 20, 2000. Thus, under ordinary circumstances, plaintiffs February 7, 2001, medical malpractice complaint (her third complaint in total) would be time-barred.
The equities of this case, however, compel a different result. The distinction between actions sounding in medical malpractice and those sounding in ordinary negligence is one that has troubled the bench and bar in Michigan, even in the wake of our opinion in Dorris. Plaintiffs failure to comply with the applicable statute of limitations is the product of an understandable confusion about the legal nature of her claim, rather than a negligent failure to preserve her rights. Accordingly, for this case and others now pending that involve similar procedural circumstances, we conclude that plaintiffs medical malpractice claims may proceed to trial along with plaintiffs ordinary negligence claim. MCR 7.316(A)(7). However, in future cases of this nature, in which the line between ordinary negligence and medical malpractice is not easily distinguishable, plaintiffs are *433 advised as a matter of prudence to file their claims alternatively in medical malpractice and ordinary negligence within the applicable period of limitations.[19]
VI. CONCLUSION
Plaintiff has stated two claims that require expert testimony and therefore sound in medical malpractice. Although these claims were filed after the applicable period of limitations had run and would ordinarily be time-barred, the procedural features of this case dictate that plaintiff should be permitted to proceed with her medical malpractice claims. The claim that defendant negligently failed to respond after learning that Ms. Hunt’s bedding arrangements created a risk of asphyxiation sounds in ordinary negligence. Finally, plaintiffs claim regarding an “accident-free environment” sounds in strict liability and is not cognizable. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the circuit court for further proceedings consistent with this opinion.
Corrigan, C.J., and Weaver, Taylor, and Young, JJ., concurred with MARKMAN, J.

 According to Tabers Cyclopedic Medical Dictionary (2002), “dementia” constitutes
progressive, irreversible decline in mental function, marked by memory impairment and, often, deficits in reasoning, judgment, abstract thought, registration, comprehension, learning, task execution, and use of language. The cognitive impairments diminish a person’s social, occupational, and intellectual abilities.
“Multi-infarct dementia” constitutes
[d]ementia resulting from multiple small strokes.... The cognitive deficits of multi-infarct dementia appear suddenly, in “stepwise” fashion. The disease is . . . most common in patients with hypertension, diabetes mellitus, or other risk factors for generalized atherosclerosis. Brain imaging in patients with this form of dementia shows multiple lacunar infarctions. [Id.]

 “Positional asphyxia” refers to suffocation that results when someone’s position prevents them from breathing properly. See <http://en.wikipedia.org/wiki/Positional_asphyxia> (accessed July 27, 2004).

 MCL 333.20201(2)(1) specifies, with regard to restraints generally, that “[a] patient or resident is entitled to he free from mental and physical abuse and from physical and chemical restraints, except those restraints authorized in writing by the attending physician for a specified and limited time. .. .” Regarding bed rails in particular, MCL 333.21734(1) provides, in relevant part:
A nursing home shall provide bed rails to a resident only upon receipt of a signed consent form authorizing bed rail use and a written order from the resident’s attending physician that contains statements and determinations regarding medical symptoms and that specifies the circumstances under which bed rails are to be used.

 Whether the CENAs actually made the report, as plaintiff notes in her brief to this Court, is in dispute.

 The trial court found that this case was indistinguishable from Starr v Providence Hosp, 109 Mich App 762; 312 NW2d 152 (1981), and Waatti v Marquette Gen Hosp, Inc, 122 Mich App 44; 329 NW2d 526 (1982).

 Unpublished opinion per curiam, issued May 21, 2002 (Docket Nos. 228972, 234992).

 468 Mich 943 (2003).

 In construing the former MCL 600.5838, in which, in the context of an accrual statute, the Legislature listed a wide array of specific health care professionals and entities who could potentially he subject to medical malpractice, we stated:
While it is true that [the former] RJA § 5838 is an accrual provision, not a definitional section, there can be no other meaning of this language other than that [those health care occupations listed in the former § 5838] may be guilty of malpractice. Otherwise, there would be no reason to list those occupations in an accrual section. A malpractice action cannot accrue against someone who, or something that, is incapable of malpractice.
. . . [The former § 5838] evidenced a legislative intent to alter the common law and subject other health professionals [as opposed to physicians and surgeons only] to potential liability for malpractice. [Adkins, 420 Mich 94-95.]
*421 The former § 5838 was amended by 1986 PA 178, as a result of which, the accrual provision relevant to medical malpractice actions was reenacted under the current § 5838a. Instead of listing specific health care professionals and entities subject to medical malpractice, the current § 5838a refers generally to a “licensed health care professional, licensed health facility or agency, or an employee or agent of a licensed health facility or agency who is engaging in or otherwise assisting in medical care and treatment....”

 Perhaps complicating an understanding of this body of law is this Court’s unanimous peremptory order in 1998 in Regalski v Cardiology Assoc, PC, 459 Mich 891 (1998). In Regalski, we were presented with a case in which the Court of Appeals had held that the plaintiffs claim that the defendant’s medical technician was negligent in assisting the patient’s movement out of a wheelchair and onto the examining table was a matter of ordinary negligence. We reversed and concluded that this was not ordinary negligence but medical malpractice.
While the facts of that case were only briefly stated, we interpret this Court’s Regalski holding to mean that the facts in that case led to the conclusion that the particular assistance rendered to that patient involved a professional relationship and implicated a medical judgment.
Even in the wake of Regalski, then, injuries incurred while a patient is being transferred from a wheelchair to an examining table (to take one example) may or may not implicate professional judgment. The court must examine the particular factual setting of the plaintiffs claim in order to determine whether the circumstances — for example, the medical condition of the plaintiff or the sophistication required to safely effect the move — implicate medical judgment as explained in Dorris.
In citing the medical malpractice accrual statute, MCL 600.5838a(l), in Regalski, we have caused some, including defendant herein, to venture that we were holding that this statute can also be understood as defining medical malpractice. This understanding is incorrect for the reasons that we have stated.

 We held in Dyer that in an action for negligence in performing an independent medical examination (ime), the plaintiffs claim sounded in medical malpractice rather than ordinary negligence, but that a physician incurred only a limited form of medical malpractice liability in performing the ime. Id. This conclusion was based on the contractual relationship between the parties.

 When the Delahunt decision was rendered in 1928, only physicians and surgeons could he sued in medical malpractice. See, for example, Kambas v St Joseph’s Mercy Hosp of Detroit, 389 Mich 249; 205 NW2d 431 (1973). As observed in n 8, the Legislature has since expanded the common-law list of those who potentially may be subject to medical malpractice liability. See MCL 600.5838a; Adkins, 420 Mich 94-95.

 Because the Court of Appeals majority in this case based its decision on plaintiffs June 1999 first amended complaint, we will use the claims in that complaint to analyze this case.

 As stated, we address only count I of plaintiffs first amended complaint. Counts II and III (negligent infliction of emotional distress and gross negligence) may be addressed by the parties on remand in light of our decision regarding count I.

 Deposition Testimony of Dr. Steven Miles (“Well, first off, there’s no such thing as generic side rails.”).

 Dr. Miles testified:
Q. Okay. When you indicated that [Hunt] required assistance for activities of daily living, are all persons who require assistance for such activities at risk for entrapment?
A. No. As I stated in my previous comment, that the overall profile is one of being frail and disabled and having poor judgment and a history of impulsive behavior and a history of previous near entrapments. These are the people who are at risk, not the presence of any one of those.

 Kara Parker and Steven H. Miles, Deaths caused by bedrails, 45 J Am Geriac Soc 797 (1997).

 Id., p 799.

 Indeed, plaintiff repeatedly stresses that defendant’s agents saw the gap between the bed and the railing and failed to recognize that this gap created a risk of asphyxiation. See § IV(B)(4) later in this opinion.

 If the trial court thereafter rules that the claim sounds in ordinary negligence and not medical malpractice, and may thus proceed in ordinary negligence, and this ruling is subsequently reversed on appeal, the plaintiff will nonetheless have preserved the right to proceed with the medical malpractice cause of action by having filed in medical malpractice within the period of limitations.