JOHNSON v BOTSFORD GENERAL HOSPITAL

Docket No. 272129. Submitted November 16, 2007, at Detroit. Decided March 11, 2008, at 9:00 a.m.

Catherine Johnson, as personal representative of the estate of Rick A. Johnson, deceased, brought an action in the Oakland Circuit Court against Botsford General Hospital and G. Scott Jennings, IV, D.O., and his professional corporation, seeking damages for the decedent's alleged wrongful death. The complaint alleged medical malpractice by Dr. Jennings and his professional corporation and vicarious liability and active negligence on the part of the hospital. The claims against the hospital, contained in ¶ 22, §§ a to u of the complaint, included the claim that a hospital employee, a registered nurse, misinformed the decedent about his insurance coverage and that this resulted in the negligent discharge of the decedent from the hospital. The vicarious-liability claims were dismissed by stipulation and, while Dr. Jennings remained a party defendant, the hospital moved for summary disposition on the basis that the plaintiff's notice of intent to bring the action only claimed that the hospital should not have discharged the decedent and did not raise an issue regarding the alleged negligent failure to inform the decedent regarding insurance coverage. In response, the plaintiff stipulated that her case was a medical malpractice case and conceded that the only claim she was pursuing against the hospital was based on its failure to take steps to allow the decedent to remain hospitalized when his surgery was postponed. The court, Edward Sosnick, J., determined that the notice of intent only advised the hospital of the plaintiff's intent to sue for the negligent discharge of the decedent, a claim reflected in ¶ 21(n) of the complaint, and dismissed the remaining claims, including those related to the alleged failure of the nurse to make further inquiries regarding the decedent's insurance coverage. When the hospital argued that the plaintiff could not present evidence regarding the appropriate standard of care pertaining to the registered nurse without the testimony of witnesses who were registered nurses, the plaintiff claimed that the claim against the hospital was for ordinary administrative negligence, not medical malpractice. The court rejected the plaintiff's argument that the registered nurse, as an administrative professional employed in

the hospital's continuing care and quality assessment department, had a duty to provide accurate insurance information and failed to do so, causing the decedent to accept a premature discharge. The court granted summary disposition in favor of the hospital, dismissing the claim reflected in ¶ 21(n). The plaintiff appealed, and the hospital cross-appealed.

The Court of Appeals *held*:

1. Nothing in the record indicates that the nurse misconstrued the hospital's billing policy or actually misinformed the decedent or his doctor, Dr. Jennings, regarding whether the insurer would pay the hospital to provide the decedent inpatient treatment to raise his blood platelet level to the point where surgery could be performed. No evidence was presented that the nurse breached any standard of care regarding the accuracy of the information she provided.

2. The standard of care proposed by the plaintiff's administrative expert must be rejected as not supported by duties recognized in Michigan.

3. The plaintiff failed to substantiate any cause of action in ordinary negligence against the hospital.

Affirmed.

WHITE, J., concurring in part and dissenting in part, concurred with the determination that the trial court properly dismissed ¶ 21(o), (p), (q), and (u) of the plaintiff's complaint, but would conclude that ¶ 21(n) was improperly dismissed. The plaintiff did not fail to plead ordinary negligence in ¶ 21(n) because she pleaded in the alternative that the defendants were negligent and committed malpractice. The plaintiff did not waive the issue whether ¶ 21(n) sounded in ordinary negligence. The jury could evaluate without expert testimony the question whether the nurse's alleged errant advice regarding insurance coverage influenced Dr. Jennings's decision to discharge the decedent from the hospital. The trial court erred in concluding that ¶ 21(n) must be dismissed because it sounded in medical malpractice. The dismissal of ¶ 21(n) should be reversed and the matter should be remanded for further proceedings.

*Sommers Schwartz, P.C.* (by *Jay G. Yasso*), for the plaintiff.

*Tanoury, Corbet, Shaw, Nauts & Essad, P.L.L.C.* (by *Linda M. Garbarino* and *David R. Nauts*), for Botsford General Hospital.

Before: ZAHRA, P.J., and WHITE and O'CONNELL, JJ.

O'CONNELL, J. Plaintiff appeals as of right from several circuit court orders of dismissal in this wrongful-death case alleging medical malpractice and negligence. Defendant Botsford General Hospital cross-appeals. We affirm.

Plaintiff's decedent, 59-year-old Rick Alan Johnson, was diagnosed in October 2002 with a large abdominal aortic aneurysm. The decedent's vascular surgeon, former codefendant Dr. G. Scott Jennings, IV, scheduled aneurysm-repair surgery for November 4, 2002, at defendant Botsford Hospital. The day before the scheduled surgery, the decedent received a presurgical workup at the hospital, but the surgery was cancelled when the decedent's blood tests showed abnormally low platelet counts.

This case arose out of events involving the decedent's discharge from the hospital on November 4, 2002. Before the decedent's discharge, hospital staff members and Dr. Jennings explained that they would have to postpone surgery until the decedent's blood-platelet level returned to a safe level. The decedent expressed complete understanding but also frustration at having spent two days in the hospital without having had surgery. He plainly stated a desire to leave the hospital, return home, and follow up with blood tests on an outpatient basis. When the decedent's family, predominantly his son, inquired whether the decedent should remain hospitalized while the decedent's blood-platelet levels returned to operable levels, Dr. Jennings advised them that insurance would not cover it. He explained that hospitalization was not medically necessary to raise the decedent's platelet level and told the decedent that continued hospitalization could potentially cost him thousands of dollars a day.

Dr. Jennings then asked that someone from the hospital's administration speak to the decedent and his family to verify his interpretation of the decedent's insurance coverage and the hospital's policy. At Dr. Jennings's request, Joanne Van Camp, a registered nurse, whom the hospital employed in its continuing care and quality assessment department, spoke to the decedent and his family and advised them that there would be no insurance coverage for a hospital stay while the surgical team waited for the decedent's platelet level to improve. The decedent indicated a deep-seated aversion to staying in the hospital, but after the decedent's family persisted, Van Camp told them that she would call the insurance company to verify its position. However, the decedent expressed an unwillingness to be billed for hospital services, and he was discharged before Van Camp called the insurance provider. The hospital billed the insurance company for the day on which the decedent was discharged, but the insurer denied that specific claim.

After being discharged, the decedent was treated by a hematologist on an outpatient basis. On November 12, 2002, the decedent's blood tests demonstrated improved levels, and he was cleared for surgery. The decedent's aneurysm ruptured on November 14, 2002. On November 15, 2002, Dr. Jennings performed surgery to repair the ruptured aneurysm. Despite the surgery, the decedent died on December 14, 2002, from complications.

Plaintiff's amended complaint alleged medical malpractice against former codefendants Dr. Jennings and his professional corporation, as well as vicarious liability and active negligence on the part of the hospital. The 22 specific claims against the hospital were contained in the complaint's ¶ 21, §§ a to u, and included the claims

that Van Camp misinformed the decedent about his medical coverage and that the hospital negligently discharged the decedent. After plaintiff's vicarious-liability claims were dismissed by stipulation, but while Dr. Jennings remained a party defendant, the hospital filed a motion for summary disposition. The motion argued that plaintiff's notice of intent to bring the action never raised an issue regarding the negligent failure to inform the decedent about his insurance, but, instead, only claimed that the hospital should not have discharged the decedent.

In response to the motion, plaintiff stipulated that "this is a medical malpractice case," and conceded that "the only claim Plaintiff is presently pursuing against Defendant Hospital is one premised on Defendant's failure to take steps to allow Plaintiff's decedent to remain hospitalized when the surgery . . . was postponed." Plaintiff again reiterated that "[t]his is a medical malpractice wrongful death case," and argued that "the decision to discharge decedent was one improperly based upon economic considerations, which were given more weight than the need to urgently address decedent's significant aneurysm." However, plaintiff supported her proposition with the testimony of a doctor who explained that the decedent should not have been discharged and the anticipated testimony of another doctor who specialized in hospital administration. Although plaintiff conceded that the issue related only to the decedent's discharge, she also argued that Van Camp should have called the insurance company and verified the decedent's coverage before advising the decedent's family. Plaintiff did not present the testimony of a nurse whose credentials materially matched those of Van Camp. See MCL 600.2169; *McElhaney v Harper-Hutzel Hosp*, 269 Mich App 488, 496; 711 NW2d 795 (2006).

The trial court held that the notice of intent only advised the hospital of plaintiff's intent to sue for the negligent discharge of the decedent, the claim reflected in ¶ 21(n), so it dismissed plaintiff's other claims, including those related to Van Camp's failure to follow up with the decedent's insurer.

After the trial court dismissed 21 out of the 22 claims, the hospital moved for clarification regarding the propriety of the remaining claim, ¶ 21(n). The hospital argued that its only contact with the decedent was through Van Camp, who was a registered nurse, so plaintiff's expert witnesses, who were not nurses, could not testify about whether Van Camp met the standard of reasonable care. In response, plaintiff shifted her position substantially and argued that her claim against the hospital was not for medical malpractice at all, but for ordinary administrative negligence. Plaintiff argued that Van Camp had a duty, as an administrative professional, to provide accurate insurance information and that she failed to do so, causing the decedent to accept a premature discharge. The trial court rejected plaintiff's new position, and granted the hospital's motion for summary disposition.

On appeal, plaintiff again argues that her case against the hospital did not involve medical malpractice, but, instead, invoked only ordinary-negligence principles. However, even if we decided to overlook plaintiff's initial characterization of her claim against the hospital as a medical-malpractice action, her bare claims of negligence, without resort to questions of medical judgment, are fatally flawed. We review de novo a trial court's decision to grant summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

A claim sounds in medical malpractice rather than in ordinary negligence when the claim relies on a profes-

sional relationship and "the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 422; 684 NW2d 864 (2004). Plaintiff contends that common knowledge and experience are sufficient to determine that it is negligent to misguide patients concerning their insurance coverage. However, plaintiff never presented any evidence that the nurse misled the decedent about whether his insurance company would pay the hospital to provide inpatient treatment to raise his platelet level. Instead, the insurance experts clarified that the hospital would not receive reimbursement from the decedent's insurer for such inpatient treatment. There is no factual dispute that the decedent's insurer, Blue Care Network, had preapproved the decedent's hospital stay on the assumption that he would receive surgery, and that the network would only reimburse the hospital a flat, lump-sum rate for all expenses associated with that surgery. Any additional expenses, including any extended stay in the hospital during the surgery's postponement, would not be reimbursed.

In fact, the hospital actually applied for separate, per diem compensation for the day on which the decedent was discharged, and the network denied the hospital's request. The network's representatives later deemed that the decedent was "covered" for his separate hospital stays only because the network "bundled" the expenses of the decedent's earlier, postponed surgery with those of his later emergency surgery and paid a single, flat rate associated with his later surgery. The network did not pay any additional money to the hospital to cover the expenses associated with the decedent's aborted surgery and would not have paid any additional money for an extended, preoperative stay to raise the decedent's platelet level. The network even rejected the

hospital's separate reimbursement claim for the preoperative inpatient care that led to the initial detection of the decedent's low platelet level. The network determined that the hospital should have detected the unacceptable levels before it admitted the decedent.

Given the limited "coverage" provided by the network, none of plaintiff's experts ventured to speculate about whether the hospital could or would directly bill the decedent for any additional days he spent hospitalized exclusively for monitoring and treatment for his platelet levels. Putting aside the serious nature of the decedent's condition, which would necessarily entail a degree of medical judgment, Van Camp was presented with a situation in which the decedent's doctor had preliminarily determined that he was stable enough to return home and receive treatment for his platelet level on an outpatient basis. The question presented was whether the decedent's insurer would pay for continued inpatient observation and blood treatment. Nothing in the record indicates that Van Camp misconstrued the hospital's billing policy or actually misinformed the decedent or his doctor about these relevant and pressing matters.[1] Notably, plaintiff's expert never opined that Van Camp breached any standard of care regarding the accuracy of the information she provided.

The standard of care that the administrative expert, Dr. Martin Merry, claimed that Van Camp breached was twofold. First, he averred that the applicable standard of practice or care required Van Camp to refrain from intervening in the decision to discharge the decedent for

---

[1] It is worth noting that the question whether the decedent's insurer would "cover" an extended observational hospital stay concerns a matter of opinion, which is not usually susceptible to a later claim of negligent misrepresentation. Expressions of opinion are not false statements of independently verifiable facts. *Mable Cleary Trust v Edward-Marlah Muzyl Trust*, 262 Mich App 485, 502; 686 NW2d 770 (2004).

financial reasons. However, the record reflects that any "intervention" was at the behest of the decedent's primary caregiver, and that the "intervention" was directly related to financial considerations only because those were the immediate concerns that Dr. Jennings and the decedent's family had about the decedent's treatment options. We are not prepared to expand the duty of hospitals to include the obligation to "refrain" from giving requested advice pertaining to a patient's legitimate financial concerns.[2] The weakness of this aspect of Dr. Merry's proposed standard of care is underscored by his suggestions regarding how Van Camp could have met the standard of care in this case. Without venturing to speculate about the utility of the exercise, he suggested that Van Camp could have met the standard by telephoning the insurance company and inquiring into the decedent's coverage.

Not only does this hypothetical omission surpass the legal bounds of proximate causation on the facts pre-

_____

[2] Strictly speaking, this would not be a duty to refrain from negligent conduct, see *Dyer v Trachtman*, 470 Mich 45, 49; 679 NW2d 311 (2004), but a duty to refrain from giving any information about the adverse financial ramifications of various medical choices, no matter how accurately presented. Dr. Merry's restrictive standard suggests that the only way Van Camp could have avoided "negligent" conduct was to reassure the decedent that the hospital would house, treat, and monitor him free of charge, or at least free of any direct financial obligation, for however long it took to bring the decedent's platelet levels up to acceptable levels. Perhaps then Van Camp would be expected to explain, without regard to the accuracy of the statement, that the hospital would continue its benevolent billing policy for the duration of any inpatient preoperative preparations, the actual surgery (which was the only real basis for reimbursement by the insurer), and any inordinate amount of recovery time the decedent's family might request after he had stabilized enough to return home. The record simply does not validate the substance of these promises, and we see no reason to compel hospital staff to make such promises or to otherwise obscure the economic consequences of choosing a given medical treatment.

sented, the suggestion ignores the fundamental basis
for the primary duty that necessarily governed Van
Camp's conduct: her relationship with the patient, the
decedent. *Dyer v Trachtman*, 470 Mich 45, 49; 679
NW2d 311 (2004). It is undisputed that Van Camp
offered to call the decedent's health insurance company,
but did not call because the decedent told her that he
did not want her to call and had no desire to prolong his
hospital stay a moment longer. Because the law does not
ordinarily require citizens to verify one another's insur-
ance coverage in workaday situations, any actionable
duty in this case necessarily derives from Van Camp's
relationship to the decedent, which in turn derived from
the hospital's professional relationship with the dece-
dent. Without some showing of the decedent's inability
to manage his medical affairs, any conceivable duty to
investigate financial ramifications and report about
them extends only to the decedent, not to third parties.
In legal parlance, the decedent nullified any arguable
duty to further investigate his insurance status when
he informally, but quite expressly, released Van Camp
and the hospital from that duty. It would transgress
basic tenets of self-determination to require hospital
personnel to intervene and postpone the discharge of a
sane and fully conscious patient, contrary to that pa-
tient's express desire, because the patient's family does
not think that the hospital staff has done enough to
determine whether the unwanted hospitalization could
continue at an affordable rate. Recognizing such a duty
would necessarily transcend the hospital's fundamental
relationship with the patient and could forseeably con-
travene its most personal and private aspects. Ulti-
mately the social-policy considerations simply do not
persuade us that we should create the duty suggested
by Dr. Merry, at least not on these facts. See *id.*

Similarly, we reject, as a matter of law, the second aspect of Dr. Merry's standard of care. Dr. Merry opined that Van Camp violated a duty of care by failing to offer the patient or his family the alternative of directly paying for the extended hospitalization. Because the decedent directly and expressly rejected the option of paying for continued hospitalization, the record directly belies any notion that Van Camp failed to convey that the decedent could personally pay for continued hospitalization. Regarding Dr. Merry's opinion that Van Camp owed a duty to extend the direct payment alternative to the decedent's family, a hospital never owes a patient the duty to ask family members if they would prefer to pay for hospitalization or have their loved one discharged. The suggestion of such a duty insinuates that the hospital is obligated to present the option even if, as in this case, the patient has expressed a reluctance to personally pay for the hospitalization. Recognizing such an obligation would require an untenable extension of a hospital's provider/patient relationship beyond all bounds of confidentiality, discretion, and ordinary sensibility. See *id.* There exists no legal duty to press members of a patient's family for payment of a loved one's medical expenses, and we will not manufacture such a duty here.

Plaintiff argues that the decision to discharge the decedent was improperly influenced by economic considerations, specifically those injected by Van Camp. Again we will not fashion a duty that would prevent a nurse from informing a patient about the possible financial ramifications of a medical decision. In this case, the decedent did not want to stay in the hospital, did not want to delay his discharge, and did not want to receive any bill for any medical procedures. Although plaintiff emphasizes the decedent's unstable medical condition, plaintiff voluntarily dismissed her vicarious-

liability claims against the hospital for Dr. Jennings's actions, voluntarily dismissed her claims arising from federal statutes that regulate the discharge of unstable patients, and no longer relies on any claim involving Van Camp's exercise of medical judgment. As the case now stands, it is impossible to craft a meaningful standard of care without inextricably entangling the issue with Dr. Jennings's medical judgment and ulti- mate decision to discharge the decedent. *Bryant, supra.* In other words, adopting plaintiff's argument would leave no room for hospitals to have frank discussions about economic realities with patients without subject- ing the hospitals to the risk that a patient might refuse a treatment that, in hindsight, could have proven beneficial. This is not the law. Without evidence that Van Camp actually misinformed the decedent about the financial implications of an extended observational hos- pital stay, and lacking any indication that the decedent wanted to remain hospitalized and would have person- ally paid for the service, plaintiff fails to substantiate any cause of action grounded on ordinary negligence against the hospital.

Affirmed.

ZAHRA, P.J., concurred.

WHITE, J. (*concurring in part and dissenting in part*). I agree that the circuit court properly dismissed ¶ 21(o), (p), (q), and (u) of plaintiff's amended complaint. I conclude that ¶ 21(n) was improperly dismissed, and in that regard dissent.

Plaintiff's complaint and amended complaint alleged medical malpractice against former codefendants Dr. G. Scott Jennings, IV, and his professional corporation, as well as vicarious liability and active negligence against

Botsford General Hospital. After plaintiff's vicarious-liability claims were dismissed by stipulation, but while Dr. Jennings remained a party defendant, the hospital (hereafter defendant) filed various motions for summary disposition. Plaintiff challenges the dismissal of the following allegations:

> 21. That, Defendants, and each of them, by and through their duly authorized agents, servants and/or employees in disregard of their duties and obligations owed to Plaintiff . . . and to Plaintiff's decedent . . . and at variance with the prevailing standards, were guilty of negligence and malpractice in the following particulars:
>
> * * *
>
> n. Negligently and improperly discharging Plaintiff's decedent from Defendant hospital on November 3, 2002,[1] all of which could and should have been avoided;
>
> o. Negligent and improper action on the part of Defendant hospital's administration, employees, agents, and/or servants by intervening in Plaintiff's decedent's clinical care by discharging him from Defendant hospital for insurance, financial reasons, all of which could and should have been avoided;
>
> p. Corporate negligence and malpractice on the part of Defendant hospital, through their [sic] administration, employees, agents and/or servants, for intervening in the decision to discharge Plaintiff's decedent on November 3, 2002, all of which could and should have been avoided;
>
> q. Failing and neglecting to offer Plaintiff's decedent the option to remain hospitalized during the admission at Defendant hospital on November 3, 2002 and to personally pay the medical/hospital expenses, all of which could and should have been accomplished;

---

[1] Plaintiff later clarified that the decedent's discharge occurred on November 4, 2002.

* * *

u. Negligent and improper misrepresentation by Defendants that Plaintiff's decedent's hospital and medical expenses would not be covered by medical insurance[.]

The allegations in ¶ 21(o), (p), (q), and (u) were dismissed on defendant's *first* motion for summary disposition. With regard to these allegations, defendant correctly argues that plaintiff failed to raise the argument that these claims sounded in ordinary negligence in response to defendant's first motion, at the hearing on the motion, or at the hearing on defendant's motion for clarification. I thus agree that these allegations were properly dismissed.

Plaintiff also challenges the dismissal of ¶ 21(n), which occurred on defendant's *second* motion for summary disposition. Defendant's first motion for summary disposition did not seek dismissal of ¶ 21(n).

Defendant brought its second motion under MCR 2.116(C)(4), (7), (8), and (10). The circuit court dismissed ¶ 21(n), noting:

This is an action for medical malpractice. The plaintiff's theory is that the defendants were negligent in coercing the plaintiff's decedent into accepting a discharge from the hospital when he had a life threatening condition. At oral argument on these motions, the parties disclosed that the defendant doctor and his corporation have settled. That settlement has since been placed on the record. The plaintiff indicated that the remaining claim was a claim against the hospital for ordinary negligence relating to its discharge procedures.

This Court has ruled previously and stated repeatedly that there is only one claim remaining in this case, a claim for medical malpractice for discharging the decedent when he had a life threatening condition. The Court agrees with the defendants that the decision to discharge a patient is a medical decision, and that negligence relating to that

decision must be brought as a medical malpractice claim. If a claim for ordinary negligence ever was pled against the hospital, it did not survive the prior motion for summary disposition, which limited the claims to the claim for malpractice set forth in paragraph 21(n) of the complaint.

Accordingly, given the settlement with the doctor and the plaintiff's admissions as to the nature of the claim it [sic] is seeking to pursue against the hospital, this case is dismissed. There are no claims remaining to be decided in light of these developments and the Court's prior rulings.

The court did not specify under which subrule it dismissed ¶ 21(n), but its opinion makes clear that the principal basis was its conclusion that plaintiff's claim sounded in medical malpractice, not ordinary negligence. The court also concluded that plaintiff failed to plead ordinary negligence, and that, even if plaintiff had pleaded ordinary negligence, such a claim would not have survived defendant's first motion for summary disposition.

In deciding a motion under MCR 2.116(C)(8) a court considers the pleadings alone. *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999). "All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Id.* at 119. "A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are 'so clearly unenforceable as a matter of law that no factual development could possibly justify recovery.' " *Maiden, supra* at 119, quoting *Wade v Dep't of Corrections*, 439 Mich 158, 163; 483 NW2d 26 (1992).

I disagree with the circuit court's conclusion that plaintiff failed to plead ordinary negligence. Plaintiff's ¶ 21 expressly states that defendants were negligent *and* committed malpractice. A plaintiff is permitted to plead in the alternative. MCR 2.111(A)(2),[2] see, e.g., *H J*

---

[2] MCR 2.111(A)(2) provides, in pertinent part:

*Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 573; 595 NW2d 176 (1999) (a plaintiff is entitled to bring alternative counts of breach of contract and implied contract). Further, as our Supreme Court noted in *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 432; 684 NW2d 864 (2000), "[t]he distinction between actions sounding in medical malpractice and those sounding in ordinary negligence is one that has troubled the bench and bar in Michigan, even in the wake of our opinion in *Dorris [v Detroit Osteopathic Hosp Corp*, 460 Mich 26; 594 NW2d 455 (1999)]*."

I conclude that viewing the pleadings alone, the circuit court read ¶ 21(n) too narrowly. Paragraph 21(n) asserts the claim that the decedent's discharge from the hospital was a consequence of ordinary negligence as much as it asserts a claim that this discharge resulted from medical malpractice.

The circuit court also concluded that even if plaintiff had pleaded ordinary negligence in ¶ 21(n), such a claim did not survive defendant's first motion for summary disposition. I disagree. Defendant's initial motion for summary disposition and the circuit court's ruling thereon were premised on defendant's argument that plaintiff had not set forth her allegations in the notice of intent to bring the action (NOI). The NOI requirement is specific to medical-malpractice claims, and has no

---

Inconsistent claims or defenses are not objectionable. A party may

\* \* \*

(b) state as many separate claims . . . as the party has, regardless of consistency and whether they are based on legal or equitable grounds or on both.

application to ordinary negligence. See MCL
600.2912b.[3] Further, as already noted, the initial motion
did not seek dismissal of ¶ 21(n) on any basis. Thus, I
see no basis for the circuit court's conclusion that
assuming that plaintiff pleaded ordinary negligence in
¶ 21(n), that claim did not survive defendant's initial
motion for summary disposition.

The majority accepts defendant's argument that
plaintiff waived the argument of ordinary negligence
by failing to raise it in response to defendant's first
motion for summary disposition, and states that
plaintiff "stipulated" that this was a medical-
malpractice case. Neither argument has merit with
regard to ¶ 21(n), in my opinion. Defendant's first
motion for summary disposition and brief in support
of the motion referred to plaintiff's claims as negli-
gence, corporate negligence, and malpractice claims.
Defendant entitled its first motion "Motion for Par-
tial Summary Disposition as to Plaintiff's Claims of
Negligence/Malpractice for Failure to Give Proper
Presuit Notice and Failure to File a Supporting
Affidavit of Merit Brief in Support of Motion" and
argued that "Plaintiff alleges active claims of
negligence/malpractice" against defendant, that
"[t]his motion seeks to dismiss any claims of active
negligence and/or malpractice against Botsford Gen-
eral Hospital," and that "[i]n paragraph 21 of Plain-
tiff's amended complaint, Plaintiff alleges corporate
negligence . . . ."

---

[3] MCL 600.2912b(1) provides:

> Except as otherwise provided in this section , a person shall not
> commence *an action alleging medical malpractice* against a health
> professional or health facility unless the person has given the
> health professional or health facility written notice under this
> section not less than 182 days before the action is commenced.
> [Emphasis added.]

Further, plaintiff's brief in response to defendant's first motion argued, in pertinent part:

> Plaintiff concedes that the only claim Plaintiff is presently pursuing against Defendant Hospital is one premised on Defendant's failure to take steps to allow Plaintiff's decedent to remain hospitalized when the surgery scheduled to be performed at the hospital was postponed. . . .
>
> \* \* \*
>
> Plaintiff's claim against Defendant Hospital boils down to the *administrative failure* to ascertain the true state of the insurance coverage available to Plaintiff's decedent, which resulted in the decision to discharge decedent being compromised by misinformation concerning this ability to meet the financial burdens of extending his hospitalization. . . . Dr. Jennings made the decision to discharge the patient laboring under a mistaken belief that had he ordered his patient to remain hospitalized to deal with the low platelets, there would have been no insurance coverage and it would have cost decedent "thousands of dollars" each day he was in the hospital.
>
> As shown above, decedent and his family made specific inquiries as to why decedent had to be discharged from the hospital and were led to believe that decedent's insurance would not cover an extended stay and that it would be futile to ask the insurance company to approve a continuing stay. But the person whose responsibility it was at the hospital to actually check into these matter[s] on behalf of the patient, Nurse Van Camp, contented herself with denying to the family that there would be coverage while negligently failing to actually check into the matter. . . . Had she checked, she would have found that there was coverage if Dr. Jennings wanted to keep decedent where he was, and the outcome could have been different. She did not check. [Emphasis added.]

Plaintiff's response brief's description of the claim as a claim of administrative failure based on the failure of Joanne Van Camp, R.N., to ascertain whether there was

coverage available for the decedent to remain in the hospital may be read as a claim of ordinary negligence. Plaintiff's counsel also argued at the hearing on defendant's motion that this was a claim of ordinary negligence. I thus conclude that plaintiff did not waive the issue whether ¶ 21(n) sounded in ordinary negligence.

Remaining is the circuit court's conclusion that ¶ 21(n) sounded in medical malpractice, and that because plaintiff did not have a nursing expert to testify, the claim was properly dismissed. "In determining whether the nature of a claim is ordinary negligence or medical malpractice . . . a court does so under MCR 2.116(C)(7)." *Bryant, supra* at 419. On a motion brought under MCR 2.116(C)(7), all well-pleaded allegations are accepted as true, unless specifically contradicted by affidavits or other documentary evidence, and construed most favorably to the nonmovant. *Bryant, supra* at 419, see also *Maiden, supra* at 119, citing *Patterson v Kleiman*, 447 Mich 429, 434 n 6; 526 NW2d 879 (1994).

*Bryant*, cited by both parties, sets forth the test to determine whether a claim sounds in ordinary negligence or medical malpractice. The plaintiff's decedent in *Bryant* died of positional asphyxiation while a patient at the defendant licensed health-care facility. *Bryant, supra* at 414. The *Bryant* Court discussed the plaintiff's complaint and the two-pronged test for determining whether claims sound in medical malpractice or ordinary negligence:

> We now turn to the complaint in the present case. Plaintiff alleges that defendant is liable for: (1) negligently failing to assure that plaintiff's decedent was provided with an accident-free environment; (2) negligently failing to inspect the bed, bed frame, and mattress to assure the plaintiff's decedent was not at risk of suffocation; (3) negligently failing to properly train its CENAs [Certified

Evaluated Nursing Assistants] regarding the risk to decedent of positional asphyxiation posed by the bed rails; and (4) negligently failing to take steps to protect decedent from further harm or injury after discovering her entangled between her bed rail and mattress on March 1. We address the application of *Dorris* to each of these claims below.

### A. PROFESSIONAL RELATIONSHIP

The first question in determining whether . . . claims sound in ordinary negligence or medical malpractice is whether there was a professional relationship between the allegedly negligent party and the injured party. This analysis is fairly straightforward and, in this case, is identical for each of plaintiff's claims. Because defendant, Oakpointe Villa Nursing Centre, Inc., a licensed health care facility, was under a contractual duty requiring both it and its employees to render professional health care services to plaintiff's decedent, a professional relationship existed to support a claim for medical malpractice.

### B. MEDICAL JUDGMENT VS. LAY KNOWLEDGE

The second question is whether the acts of negligence alleged "raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment." [*Id.* at 424-425, citing *Dorris, supra* at 46.]

"If *both* these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions." *Bryant, supra* at 422 (emphasis added).

The *Bryant* Court concluded that one of the plaintiff's claims—that the defendant negligently and recklessly failed to take steps to protect the plaintiff's decedent when she was discovered entangled between the bed rails and the mattress the day before she was asphyxiated—sounded in ordinary negligence, noting:

We turn, finally, to a claim fundamentally unlike those discussed previously. Plaintiff alleges that defendant "[n]egligently and recklessly fail[ed] to take steps to protect plaintiff's decedent when she was, in fact, discovered on March 1 [1997] entangled between the bed rails and the mattress."

This claim refers to an incident on March 1, 1997—the day before Ms. Hunt was asphyxiated—when two of defendant's CENAs [Certified Evaluated Nursing Assistants] found Ms. Hunt tangled in her bedding and dangerously close to asphyxiating herself in the bed rails. According to the CENAs, they moved Ms. Hunt away from the rail and informed their supervising nurses that Ms. Hunt was at risk of asphyxiation.

Plaintiff now contends, therefore, that defendant had notice of the risk of asphyxiation through the knowledge of its agents and, despite this knowledge of the problem, *defendant did nothing to rectify it*. It bears repeating that plaintiff's allegation in this claim is not that defendant took inappropriate steps in dealing with the patient's compulsive sliding problem or that defendant's agents were negligent in creating the hazard in the first place. Instead, plaintiff claims that defendant knew of the hazard that led to her death and did nothing about it.

This claim sounds in ordinary negligence. No expert testimony is necessary to determine whether defendant's employees should have taken *some* sort of corrective action to prevent future harm after learning of the hazard. The fact-finder can rely on common knowledge and experience in determining whether defendant ought to have made an attempt to reduce a known risk of imminent harm to one of its charges.

\* \* \*

. . . Professional judgment might be implicated if plaintiff alleged that defendant responded inadequately, but, given the substance of plaintiff's allegation in this case, the fact-finder need only determine whether *any* corrective action to reduce the risk of recurrence was taken after

defendant's agents noticed that Ms. Hunt was in peril. Thus, plaintiff has stated a claim of ordinary negligence under the standards articulated in *Dorris*. [*Id*. at 430-432 (emphasis in original).]

There is no dispute that a professional relationship existed to support a claim for medical malpractice. *Id*. at 425.

Regarding the second prong of the test discussed in *Bryant*—"whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience," *Bryant, supra* at 422, plaintiff contends that common knowledge and experience inform that it is careless to misguide patients concerning their insurance coverage. Plaintiff notes that her claim focuses on the decision to discharge the decedent to go home rather than keep him in the hospital to build up his platelet count in order to reschedule the aortic aneurysm surgery as soon as his platelet count was satisfactory. Plaintiff contends that the decision to discharge the decedent was improperly influenced by economic considerations, specifically by representations made by Joanne Van Camp, R.N., defendant's employee.

Regarding the events preceding the decedent's leaving the hospital, the majority engages in extensive fact-finding, which, in my opinion, is inappropriate given that this is an appeal challenging a summary disposition determination. The majority additionally engages in an extensive discussion of the issues of duty and proximate cause, in the context of that fact-finding, although the issues presented by both parties focused only on the questions whether the claim at issue sounds in ordinary negligence or malpractice and whether plaintiff adequately supported her claim with a qualified expert.

I conclude that a jury could evaluate without assistance the question whether hospital personnel called on to inform a patient regarding insurance coverage, under the circumstances presented in this case, should convey only verified information. A jury could also evaluate without assistance whether the decision to discharge the decedent was influenced by Van Camp's saying to the decedent and his family, among other things, that "[t]hey [the insurance company] are going to say to us, we aren't going to pay for this," and "[w]e [Botsford Hospital] are going to be lucky if we can get today covered because nothing was done." Plaintiff's claim is that Van Camp's errant advice regarding insurance coverage influenced Dr. Jennings's decision to discharge. I conclude that a jury could evaluate that question without expert testimony and, thus, that the circuit court improperly dismissed ¶ 21(n) as sounding in medical malpractice.

I would reverse the dismissal of ¶ 21(n) and remand for further proceedings.