*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VICKI JO WESENICK, Personal Representative of the ESTATE OF JAY R. WESENICK,

Plaintiff-Appellee,

v

KUCHUNNI MOHAN, M.D., K. MOHAN, M.D., PC, and K. MOHAN, M.D. & JAPHET JOSEPH, M.D., PC,

Defendants-Appellants,

and

ERNEST SORINI, M.D.,

Defendant.

UNPUBLISHED
July 14, 2022

No. 356558
Bay Circuit Court
LC No. 2019-003092-NM

Before: GLEICHER, C.J., and GADOLA and YATES, JJ.

PER CURIAM.

Statistically, most heart attacks result from a reduction of blood flow in a coronary artery supplying oxygen to the anterior portion of the heart. But some myocardial infarctions—15 to 20%, according to an estimate in evidence—involve the heart's posterior wall. Jay Wesenick suffered a posterior wall infarction. His estate claims that a delay in diagnosing and treating it caused Wesenick's death.

Among others, the estate sued Dr. Kuchunni Mohan, a cardiologist consulted by phone while Wesenick was in the emergency room. Dr. Mohan argues that the consult was not "formal" because it was not recorded in Wesenick's chart as a "consult order." Without a formal consult, Dr. Mohan claims, he had no physician-patient relationship with Wesenick and no duty of care. And by the time the consultation was reduced to writing, Dr. Mohan insists, it was too late to have saved Wesenick's life.

The evidence and the estate's experts' testimonies refute these legal arguments, creating material questions of fact. The circuit court properly denied summary disposition on duty and proximate cause grounds, and we affirm.

## I. FACTUAL BACKGROUND

Jay Wesenick, age 53, presented in the McLaren Bay Region emergency room with heart palpitations. He reported that he had previously undergone coronary bypass surgery. Dr. Ernest Sorini, an emergency room physician and a defendant, ordered an electrocardiogram which confirmed that Wesenick's heart was beating rapidly in an abnormal rhythm, called tachyarrhythmia. The EKG also revealed a finding at the center of the estate's malpractice claim: ST depressions in the V1-V3 leads, also called "the early precordial leads."

An EKG measures the heart's electrical activity. In a standard EKG, 12 leads are placed on the chest and limbs. The leads labeled V1-V3 are chest leads that detect the electrical activity in the front of the heart. The electrical activity is represented by familiar peaks, valleys, and wave forms that appear on a paper tracing. Doctors map the tracing with letters corresponding to the voltage changes that occur with each heartbeat. Especially when accompanied by clinical symptoms, elevations seen in a part of the tracing called the ST segment signal a possible heart attack. Physicians call this finding a STEMI: an ST elevation myocardial infarction. The parties agree that when a STEMI is detected, the standard of care requires that a cardiologist see the patient within 30 minutes. Dr. Sorini explained, "[A]nybody who has a STEMI has to be anticoagulated and taken to the cath lab immediately."

Wesenick's EKG showed ST segment *depressions* in leads V1-V3. Dr. Richard Konstance, one of the estate's expert witnesses, explained that ST segment depressions in those leads are "equivalent" to ST elevations in other leads and are "indicative" of a STEMI. Another expert, Dr. Benjamin Freed, agreed that ST segment depressions in leads V1-V3 "create a suspicion" of a posterior wall myocardial infarction.

Wesenick's blood also revealed evidence of a heart attack. Troponin is a protein that leaks from damaged muscle cells (and the heart is a muscle). Wesenick's troponin level was 9.24 ng/ml. The top of the normal range for this test is 0.058 ng/ml. The estate's experts testified that combined with the EKG, this finding demonstrated that Wesenick likely had suffered an infarction in the posterior wall of his heart.

Dr. Sorini treated Wesenick by performing a cardioversion, a procedure using electrical shocks to restore the heart to a normal rhythm. The cardioversion worked, but soon after Wesenick became nauseous and vomited. Dr. Sorini thought that medication given during the cardioversion triggered the nausea and vomiting. But Wesenick's symptoms continued even after Dr. Sorini "reversed" the drugs, calling this theory into doubt. Dr. Sorini ordered a chest x-ray. The chest x-ray was performed two hours after Wesenick's arrival in the ER and reported "congestive heart failure and pulmonary edema," additional abnormal findings.

Dr. Sorini testified that he was not "sure what was going on except to say that it was very unusual to have nausea and vomiting . . . after a cardioversion, and . . . he had ST segment depression also, even though he was in regular sinus rhythm, so I knew there was something wrong." Dr. Sorini believed that Wesenick had suffered an event called an NSTEMI—shorthand for a non-STEMI. A non-STEMI is a heart attack that does not display ST segment elevations on an EKG. It need not be treated as urgently as a STEMI. With the NSTEMI diagnosis in mind, Dr. Sorini called an internist, Dr. Ali, for permission to admit Wesenick to the hospital. Dr. Ali asked Dr. Sorini to call a cardiologist. Dr. Sorini called Dr. Mohan, who was on call for cardiology that evening.

Dr. Sorini did not take notes during his conversation with Dr. Mohan. According to the medical record, the call took place at 10:24 p.m., about 2½ hours after Wesenick had entered the ER. Dr. Sorini testified about the conversation as follows:

> *Q.* And what do you recall telling him?
>
> *A.* I told him that he was a patient of Dr. Ali's, I was trying to admit him to Dr. Ali, but Ali wanted me to call him, and that he had high troponin, he had ST segment depression on the early precordial leads, I put him on Heparin, and what would you like me to do with him.
>
> \* \* \*
>
> *Q.* . . . [I]f you know, does a cardiologist on call have access to the computer system to see test results in the ER?
>
> *A.* Yes. Oh, yeah.
>
> \* \* \*
>
> *Q.* Did you expect Dr. Mohan to come in and evaluate this patient?
>
> \* \* \*
>
> THE WITNESS: No.
>
> *Q.* You didn't?
>
> *A.* No. *I gave him the information, and I asked him what he thinks we should do, and he said put him in the stepdown unit and I'll take it from there. . . .* [Emphasis added].

Dr. Sorini recorded in Westenick's chart:

> Admit to 5 East, cardiac stepdown. Dr. Mohan. Heparin drip. Status post-atrial fibrillation. Cardioversion in ED. Intractable nausea with ST segment depression in V leads. Call Dr. Mohan for orders. Thank you. Sorini, M.D.

Dr. Sorini characterized the discussion he had with Dr. Mohan as a "consultation": "Well, after consultation with a cardiologist, who I dare say knows way more than I do about that, he asked me to put the patient in the stepdown unit, and he's done that many times before."

Dr. Mohan testified that he had no memory of his conversation with Dr. Sorini. He was certain, however, that he never reviewed Wesenick's EKG tracing, despite acknowledging that he could have asked Dr. Sorini to "text" it to him.

Wesenick was transferred from the ER to the stepdown unit, where his condition worsened. He developed respiratory distress and was admitted to the ICU. At 1:30 a.m., about six hours after Wesenick arrived in the ER, Dr. Ali placed a formal, written order for consultation with Dr. Mohan in Wesenick's chart. At 8:30 that morning, an ICU nurse called another cardiologist about Wesenick. That cardiologist took Wesenick to the cardiac catheterization lab within 15 minutes of receiving the call. The catheterization revealed a complete occlusion of one of Wesenick's coronary artery grafts, blocking blood flow to the posterior portion of his heart. During the procedure the clot broke free, causing a "no-flow phenomenon" and cardiac arrest. Wesenick died shortly after the catheterization.

Dr. Konstance testified that Dr. Mohan breached the standard of care by failing to suspect that Wesenick had a posterior myocardial infarction, by failing to review the EKG, and by failing to come to the hospital urgently to perform a catheterization. He stressed that a cardiologist consulted by an ER physician must review the EKG, adding "the findings of that EKG need to be incorporated into the decision-making. . . . So in my opinion, the cardiologist is on the hook for knowing what the EKG showed once he's involved . . . in the care." Dr. Mohan further breached the standard of care by not coming to the hospital to see the patient and to personally review the EKG, in Dr. Konstance's estimation. Under the circumstances, Dr. Konstance opined, Wesenick should have been taken to the cath lab within 90 minutes of his hospital arrival.

Dr. Benjamin Freed, another cardiology expert, testified that "the golden window" for a more-likely-than-not change in Wesenick's outcome was six hours from the onset of the myocardial infarction, which Dr. Freed timed as having occurred an hour or two before Wesenick's presentation in the ER. He reiterated:

> *Q.* But your opinion is that from a causation standpoint, if the posterior MI would have been picked up within that six-hour period of time from onset of his MI in the time frame that we talked about, the failure to do that led to this gentleman suffering myocardial damage and injury which caused his death; true?
>
> *A.* That's my point.
>
> *Q.* That's a fair summary of what your causation opinion is?
>
> *A.* That's fair.

After extensive discovery including the depositions of several expert witnesses, Dr. Mohan brought two motions for summary disposition and a motion to strike the testimony of Dr.

Konstance. The circuit court denied the motions and we granted Dr. Mohan's application for leave to appeal. *Estate of Jay R Wesenick v Ernest Sorini MD*, unpublished order of the Court of Appeals, entered June 16, 2021 (Docket No. 356558).

## II. ANALYSIS

Dr. Mohan offers three arguments in this interlocutory appeal. He contends that because he was not formally consulted until 1:30 a.m., he could not have done anything to save Wesenick's life. His appellate brief summarizes: "[S]imply put, the window of opportunity closed before Wesenick became Dr. Mohan's patient." Therefore, Dr. Mohan reasons, the estate cannot establish causation. Anticipating the estate's response, Dr. Mohan next asserts that he had no duty to provide medical services to Wesenick because they had not forged a doctor-patient relationship. The relationship was not formed, Dr. Mohan urges, until he was formally consulted at 1:30 a.m. And Dr. Konstance's testimony that Dr. Mohan breached the standard of care should be stricken, Dr. Mohan maintains, because it was rooted only in "Dr. Konstance's personal practice and hindsight."

In reviewing these contentions, we adhere to a core summary disposition principle: the evidence presented at the summary disposition stage must be viewed in the light most favorable to the nonmoving party. *Kemp v Farm Bureau Gen Ins Co of Mich*, 500 Mich 245, 251; 901 NW2d 534 (2017). We must credit competent evidence presented by the nonmoving party and draw all reasonable inferences supported by that evidence. And we may not make findings of fact or assess the credibility of witnesses. *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142-143; 753 NW2d 591 (2008); *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). When the record leaves open an issue on which reasonable minds could differ, a genuine issue of material fact exists, precluding summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

The court essentially treated Dr. Mohan's "motion to strike" Dr. Konstance's testimony as part of the motion for summary disposition. We review the trial court's decision to reject Dr. Mohan's evidentiary arguments for an abuse of discretion. *Kalamazoo Oil Co v Boerman*, 242 Mich App 75, 78; 618 NW2d 66 (2000).

## A. THE PHYSICIAN-PATIENT RELATIONSHIP

Medical malpractice only occurs "within the course of a professional relationship". *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 422; 684 NW2d 864 (2004) (quotation marks and citation omitted). "Any negligence-based claim must, as its starting point, identify a legal duty owed by one to another. If there is no duty, then there is no negligence." *Randall v Mich High Sch Athletic Assn*, 334 Mich App 697, 720; 965 NW2d 690 (2020).

Dr. Mohan largely rests his duty argument on this Court's decision in *Oja v Kin*, 229 Mich App 184; 581 NW2d 739 (1998). There, an emergency room resident physician called defendant Kin, an ear, nose and throat specialist, at home and requested that Dr. Kin come to the hospital. Dr. Kin "informed the resident that he was not feeling well and would not go to the hospital. He further indicated that the resident should contact another physician to assist her." *Id*. at 185-186.

-5-

Two more calls to Dr. Kin yielded the same response. *Id.* at 186. This Court rejected that the plaintiff had established a physician-patient relationship with Dr. Kin. We explained that "a physician's on-call status alone" does not create a physician-patient relationship, *id.* at 190, unlike "the other end of the spectrum," in which "a doctor who is on call and who, on the phone or in person, receives a description of a patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship." *Id.* at 191. The Court concluded that "an implied consent to a physician-patient relationship may be found only where a physician has done something, such as participate in the patient's diagnosis and treatment, that supports the implication that she consented to a physician-patient relationship." *Id.*

This case bears no resemblance to *Oja*. Here, Dr. Sorini called Dr. Mohan for advice regarding how to treat Wesenick, and Dr. Mohan responded by giving advice. Dr. Mohan could have said: "Write a formal consult and then I will decide whether to give instructions about the patient's care." Or, he could have told Dr. Sorini that he had no opinion about what to do and would not form one until someone wrote an order consulting him. Instead, Dr. Mohan listened to Dr. Sorini's description of Wesenick's situation and told Dr. Sorini to "put him in the stepdown unit and I'll take it from there." Unlike in *Oja*, Dr. Mohan "participate[d] in the patient's diagnosis and treatment" by accepting that Wesenick's cardiac event was an NSTEMI and that he should be placed in a step-down unit rather than undergoing immediate cardiac catheterization.

The evidence supports that Dr. Sorini understood that Dr. Mohan agreed to undertake Wesenick's cardiology care and had access to the EKG. This was not a "curbside consultation" in which one physician informally solicits another doctor's opinion. Rather than merely offering courtesy advice, Dr. Mohan, the on-call physician for cardiac emergencies that evening, accepted the referral of and responsibility for a critically ill patient being admitted to a unit one "step-down" from an ICU. His instruction to admit Wesenick to the step-down unit was not perceived by Dr. Sorini as an informal recommendation that Dr. Sorini could accept or reject. When he called Dr. Mohan, Dr. Sorini was looking for cardiology assistance to unravel an "unusual" cardiac situation that Dr. Sorini could not figure out. Viewed in the light most favorable to the estate, the evidence supports that by affirmatively agreeing to direct Wesenick's treatment, Dr. Mohan entered into a physician-patient relationship triggering a duty of care.

## B. DR. KONSTANCE'S STANDARD OF CARE TESTIMONY

Dr. Mohan next challenges the admission of Dr. Konstance's standard of care testimony, alleging that it does not satisfy MRE 702. According to Dr. Mohan, Dr. Konstance's testimony that the standard of care required a consulting cardiologist to suspect a posterior myocardial infarction depended only on "Dr. Konstance's personal practice and hindsight" and lacked a "reliable basis."

Once again, the evidence refutes this argument. Dr. Konstance repeatedly expressed that Wesenick's EKG showed the equivalent of a STEMI. He summarized: "[T]he presentation of a patient with established coronary disease with tachyarrhythmia, specifically a-fib, although not necessarily related to the acute MI, who develops ST segment depression in V1 through V3 following cardioversion in association with nausea and vomiting requires further investigation." That investigation, he explained, mandated that Dr. Mohan review the EKG and come to the hospital to examine Wesenick. Based on Dr. Sorini's description of the EKG, Dr. Konstance

testified, Dr. Mohan should have recognized "true posterior" myocardial infarction. And had he reviewed the EKG tracing, Dr. Konstance added, the posterior injury would have been "undeniable."

Dr. Konstance's expert testimony addressing the standard of care hinged on Dr. Mohan's failure to review the EKG. After repeatedly emphasizing that Dr. Mohan was required to personally look at the tracing, Dr. Konstance explained that when Dr. Sorini reported ST depressions in V1, 2 and 3, Dr. Mohan should have considered a posterior myocardial infarction. This testimony synced neatly with that of the cardiologist who eventually performed the catheterization, who answered affirmatively when asked: "So, it's part of your normal routine and practice when you're called to consult on a cardiac patient to review the EKG; is that a fair statement?"

Contrary to Dr. Mohan's argument, Dr. Konstance framed his standard of care testimony generally, not solely in terms of what he himself would have done. Dr. Mohan's complaint that Dr. Konstance's opinions were based only on "hindsight" also lacks record support. Dr. Konstance rested his opinions on the facts available to Dr. Mohan at the time he was consulted rather than on later-acquired knowledge or information that Dr. Mohan could not have known. We detect no abuse of discretion arising from the circuit court's refusal to strike Dr. Konstance's testimony.

## III. PROXIMATE CAUSATION

MCL 600.2912a(2) states:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Dr. Mohan contends that by 1:30 a.m. when the "formal consultation" was placed in the medical record, Wesenick's chance of survival was less than 50%. Given the estate's experts' testimony, Dr. Mohan is correct. And if the jury determines that the standard of care did not require Dr. Mohan to personally examine the patient or the EKG, or to suspect a posterior wall infarction, the jury will likely find in Dr. Mohan's favor.

But once again, when viewed in the light most favorable to the estate, ample evidence supports that if Dr. Mohan had taken Wesenick to the cath lab shortly after being contacted by Dr. Sorini, Wesenick would have survived. Dr. Freed, the estate's proximate cause expert, testified that after a posterior wall infarction there is a six-hour window of opportunity for life-saving treatment. Dr. Sorini's 10:24 p.m. call to Dr. Mohan took place approximately four hours after Wesenick's heart attack began, according to Dr. Freed's calculations. Dr. Freed succinctly summarized: "[M]y opinion is that this was a missed diagnosis that led to his death." This evidence suffices to create a material question of fact regarding proximate cause. Accordingly, summary disposition was precluded.

-7-

We affirm and remand for further proceedings without retaining jurisdiction. The estate may tax its costs. pursuant to MCR 7.219(A).

/s/ Elizabeth L. Gleicher
/s/ Michael F. Gadola
/s/ Christopher P. Yates