*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANN PAKENAS, Personal Representative of the
ESTATE OF JOHN EDWARD ROGERS,

      Plaintiff-Appellant,

v

MCLAREN MACOMB, doing business as
MCLAREN MEDICAL CENTER-MACOMB,

      Defendant-Appellee.

UNPUBLISHED
September 11, 2025
2:44 PM

No.  368752
Macomb Circuit Court
LC No.  2022-004355-NH

ANN PAKENAS, Personal Representative of the
ESTATE OF JOHN EDWARD ROGERS,

      Plaintiff-Appellee,

v

MCLAREN MACOMB, doing business as
MCLAREN MEDICAL CENTER-MACOMB,

      Defendant-Appellant.

No.  372858
Macomb Circuit Court
LC No.  2022-004355-NH

Before:  GADOLA, C.J., and BOONSTRA and TREBILCOCK, JJ.

PER CURIAM.

These consolidated appeals arise out of a fatal slip-and-fall in a hospital shower during the early days of the COVID-19 pandemic.  The trial court found the Pandemic Health Care Immunity Act (PHCIA), MCL 691.1471 *et seq.*, barred plaintiff's negligence claim but permitted a gross negligence claim to proceed.  Because the PHCIA does not apply to plaintiff's negligence claim and because no record evidence supports plaintiff's gross negligence claim, we reverse the trial court and remand for further proceedings.

-1-

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

On April 11, 2020, during the second month of the COVID-19 pandemic, defendant, McLaren Macomb hospital (McLaren), admitted decedent, John Edward Rogers, with complaints of cough, shortness of breath, a fever, and chills. However, he tested negative for COVID-19 and McLaren never treated him for COVID-19.

This was during the early stages of the pandemic and patients were not doing well, with staff having trouble keeping up and nurse assistants not being allowed to work with COVID-19 patients. Those patients demanded more attention—the nurse-to-patient ratio was low for COVID-19 patients given the risk of transmission and the time needed to put on protective gear, which was in short supply. Approximately half the patients on Rogers' floor had COVID-19.

On April 17, 2020, the hospital's staff were preparing Rogers for discharge, and he asked his nurse if he could shower prior to leaving the hospital. Rogers used a cane and a walker for ambulating, and it is undisputed that he was at a high risk for falling because of his general weakness, blood thinner medication, other prescribed medications, and difficulty ambulating. One of his physicians agreed to the shower request because he had been ambulating without oxygen use or assistance that day.

But then his nurse received an urgent request to transfer a COVID-19 patient to intensive care, forcing her to leave Rogers in the care of a nurse assistant. The assistant set up the shower and directed him to sit in the shower chair. She stayed with him for most of the shower but saw the floor was getting quite wet and wanted to retrieve additional towels. Knowing that it could be dangerous to do so, she instructed Rogers not to get up from the shower chair while she left to obtain a towel, and he promised he would remain seated. She did not push the call light to summon staff for a towel because she observed he was clear-headed and understood her directions, and she knew she would be away only a couple of seconds.

During those few moments of being alone in the shower, Rogers fell. When the assistant returned, he was on the floor outside the shower and said he slipped while stepping out and that his hip hurt. He later complained of a severe headache. Staff conducted tests and transferred him to the intensive care unit. He died two days later from a traumatic subdural hemorrhage.

Plaintiff, Ann Pakenas, Personal Representative of the Estate of John Edward Rogers, filed the instant wrongful-death lawsuit, alleging, among other things, that defendant's staff was negligent in evaluating his fall risk, failing to give him assistive devices, allowing him to shower without assistance, and failing to promptly advise his doctors after he fell. On defendant's motion for summary disposition under MCR 2.116(C)(7) and (C)(10), the trial court dismissed plaintiff's complaint after concluding that—based on COVID-19's effect on staffing (including the calling away of his nurse), the additional tasks undertaken to avoid spreading COVID-19 within the hospital, and the limited resources—the hospital was entitled to immunity under the PHCIA. Plaintiff applied for leave to appeal, which this Court granted. *Estate of John Edward Rogers v McLaren Macomb,* unpublished order of the Court of Appeals, entered April 26, 2024 (Docket No. 368752).

Meanwhile, the trial court permitted plaintiff to amend her complaint to add allegations of gross negligence. Specifically, she stated defendant and its employees, nurses, and agents owed Rogers a duty "to refrain from engaging in conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." The complaint alleged 24 different breaches—albeit the same instances included in the initial complaint—that amounted to gross negligence and claimed defendant was legally responsible for the gross negligence of its employees. Defendant then moved for summary disposition under MCR 2.116(C)(8) and (C)(10) regarding the gross negligence allegations in plaintiff's amended complaint, which the trial court denied (as well as a subsequent motion for reconsideration). This Court granted defendant's application for leave as well, and then consolidated the appeals. *Estate of John Edward Rogers v McLaren Macomb*, unpublished order of the Court of Appeals, entered December 11, 2024 (Docket No. 372858).

## II. IMMUNITY UNDER THE PHCIA

Plaintiff argues decedent's injury did not occur while defendant was providing services in support of the COVID-19 pandemic; rather, the injury occurred when defendant failed to provide services unrelated to COVID-19, such that the trial court erred in granting summary disposition. On de novo review, *Bryant v Oakpointe Villa Nursing Ctr*, 471 Mich 411, 419; 684 NW2d 864 (2004), we agree.

In response to the emerging COVID-19 pandemic, on March 10, 2020, Governor Gretchen Whitmer declared a statewide emergency under the Emergency Powers of the Governor Act of 1945, MCL 10.31 *et seq.*, and the Emergency Management Act, MCL 30.401 *et seq.* On March 29, 2020, Governor Whitmer issued Executive Order 2020-30, which, in part, offered immunity to health care facilities to enable the response to the pandemic:

> Consistent with MCL 30.411(4),[1] any licensed health care professional or designated health care facility that provides medical services in support of this state's response to the COVID-19 pandemic is not liable for an injury sustained *by a person by reason of those services*, regardless of how or under what circumstances or by what cause those injuries are sustained, unless it is established that such injury or death was caused by the gross negligence, as defined in MCL 30.411(9), of such health care professional or designated health care facility. [Executive Order 2020-30, ¶ 7 (footnote and emphasis added).]

The order was effective immediately, and continued until the declared emergency ended. Executive Order 2020-30, ¶ 13. A series of executive orders extending the declared emergency and dictating healthcare facilities' responses to the pandemic followed through the fall of 2020. See, e.g., Executive Order 2020-61 and Executive Order 2020-150. But, in October 2020, our Supreme Court ruled that the Governor did not have the authority to extend the state of emergency,

---

[1] MCL 30.411(4), within the Emergency Management Act, provides immunity for licensed medical practitioners when they are rendering disaster relief, with exceptions for omissions and actions that are willful or amount to gross negligence.

effectively invalidating the Executive Orders' liability shields. *In re Certified Questions from the United States Dist Court, Western Dist of Mich, Southern Div*, 506 Mich 332; 958 NW2d 1 (2020).

The Legislature then adopted the PHCIA, effective on October 22, 2020, with an immunity provision akin to the one in EO 2020-30, providing:

> A health care provider or health care facility that *provides health care services in support of this state's response to the COVID-19 pandemic* is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. [MCL 691.1475(5) (emphasis added).]

The PHCIA defines "health care services" as "services provided to an individual by a health care facility or health care provider regardless of the location where those services are provided, including the provision of health care services via telehealth or other remote method." MCL 691.1473(d). Finally, the Legislature expressly indicated the section was retroactive: "The liability protection provided by this act applies retroactively, and applies on or after March 29, 2020 and before July 14, 2020." MCL 691.1477.[2]

At issue here is whether the services defendant provided to Rogers leading up to his injury and death were healthcare services in support of the response to the pandemic. This Court has now interpreted that phrase in three published opinions, which make clear that the PHCIA's grant of immunity depends upon the facts and circumstances of each case. To those cases we now turn.

We begin with *Franklin v McLaren Flint*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 366226). There this Court determined the statutory phrase "provides health care services in support of" means "providing any healthcare services that assisted, helped, or promoted the state's response to the COVID-19 pandemic." *Id*. at ___; slip op at 7. The *Franklin* Court also gave meaning to the PHCIA's "this state's response to the COVID-19 pandemic" phrasing—it means "the state's reactions and actions taken as a result of the COVID-19 pandemic." *Id*. at ___; slip op at 8. Providing definition to the scope of PHCIA, the Court concluded that the statute included services given "to those infected with COVID-19 and regular healthcare services provided during the statutory period," *id*., and that the statutory language regarding injury or death was broad, thus demonstrating it covered "all possible deaths or injuries . . . unless excepted," *id*. at ___; slip op at 9.

Based on that reading, the *Franklin* Court concluded the PHCIA's immunity provision barred the plaintiff's claims. *Id*. at ___; slip op at 10. The plaintiff was treated for COVID-19 at

---

[2] Where the Legislature expressly indicated the liability section was retroactive, the language cannot be construed in a way other than to give retroactive effect. Decedent's fall occurred in April 2020, which is within the statutory time frame. If the PHCIA applies, it would do so retroactively in this case.

the defendant hospital from March 31, 2020 until May 26, 2020, during which time he developed pressure ulcers, for which he received minimal treatment from the defendant's nursing staff that he contends were the result of negligence. Those ulcers, this Court reasoned, arose from "the care defendant provided in response to COVID-19." *Id*. at ___; slip op at 9. The Court explained: "[T]hose injuries were sustained by reason of the healthcare services provided by defendant in support of the state's response to the COVID-19 pandemic." *Id*. In sum, the plain language of the PHCIA covered the sequence of events that led to the plaintiff's injury. *Id*. at ___; slip op at 10.

Next is *Skipper-Baines v Bd of Hosp Managers for the City of Flint*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 365137). The decedent there was being treated for a gallbladder issue, not COVID-19, and was placed in a room with a roommate who had a known propensity for violence. Soon after, the roommate attacked the decedent and inflicted fatal injuries (although one of the causes of death was COVID-19 because the decedent contracted it at some point after his hospital admission). The *Skipper-Baines* Court held the PHCIA did not bar the plaintiff's medical malpractice and ordinary negligence claims because the services that allegedly caused the injury were not provided "in support of this state's response" to the COVID-19 pandemic. In reaching this conclusion, the Court cited that the decedent sought treatment for a gallbladder procedure, he was not treated for COVID-19, the roommate also was not treated for COVID-19, and the materials did not reflect that COVID-19 provoked the attack. The Court further explained:

> The alleged negligent act was placing [the decedent] in a room with an unsafe roommate, and the alleged omission was failing to deploy adequate safeguards to protect the decedent from the roommate whom was known to be unsafe. It is clear to us that neither of those were done in support of the pandemic response. There certainly will be gray area with respect to whether medical services were offered in support of the state's pandemic response, but this particular case is black and white. The alleged acts, omissions, and injuries were wholly unrelated to the pandemic, so deeming defendant immune would contravene the Legislature's clearly-communicated intent to limit this immunization to services stemming from the pandemic. The fact that the decedent apparently contracted COVID-19 at some point following his admission does not change the fact that he was not being treated at the hospital for COVID-19 or that the incident giving rise to this litigation was completely separate. [*Id*. at ___; slip op at 3.]

And in so concluding, this Court found no legislative intent in the PHCIA for all medical providers to be free from liability except for gross negligence. Rather, PHCIA immunity requires some connection to COVID-19, even if the patient was not being treated for COVID-19. *Id*. at ___; slip op at 4. And, as detailed above, "there was absolutely no connection" between the malpractice alleged and the COVID-19 pandemic, and, therefore, PHCIA immunity did not apply. *Id*.

*Jokinen v Beaumont Hosp Troy*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 370983), is this Court's most recent matter addressing a claim of immunity under the PHCIA. There the elderly decedent was admitted to the hospital after she fell, and two days later, staff noted a skin tear, which put her at risk for pressure sores. The hospital treated the wound and discharged her to the defendant rehabilitation center 10 days after the skin tear was observed. Over the next three weeks, the tear ulcerated, and the decedent's condition deteriorated. Tests for

COVID-19 came back negative. At the request of her son, the decedent was admitted again to the hospital with the sacral decubitus ulcer. Two days later, she died; the cause of death included sepsis due to the infected ulcer. The plaintiff brought suit against the hospital and the rehabilitation center, alleging medical negligence by the nursing staff for the pressure injury treatment.

Finding the facts closer to *Skipper-Baines* than *Franklin*, this Court's *Jokinen* decision held the PHCIA's immunity provision was not available: "Unlike the plaintiff in [*Franklin*], the decedent in this case was not admitted to the hospital with symptoms of COVID-19, she was never treated for COVID-19, and there is no indication that she ever tested positive for COVID-19. Indeed, those facts make the request for immunity here even weaker than the immunity claim that this Court rejected in *Skipper-Baines*, where the decedent suffered injuries unrelated to COVID-19, but subsequently contracted COVID-19 while hospitalized, and then died of the disease." *Id*. at ___; slip op at 7. The *Jokinen* Court also rejected the defendants' argument that any deficiency in treating the decedent's pressure ulcer arose from the chaos of the pandemic because the trial court granted summary disposition under MCR 2.116(C)(8), and the complaint did not support that argument. Further, the Court concluded that the defendants' broad reading of the statute made it " 'difficult to imagine any scenario in which a medical malpractice suit arising from acts and omissions occurring during the COVID-19 emergency could proceed.' " *Id*. at ___; slip op at 7, quoting *Skipper-Baines*, ___ Mich App at ___; slip op at 4.

This case is closer to *Skipper-Baines* and *Jokinen* than to *Franklin*. First, we once again emphasize that the PHCIA does not grant blanket immunity: "The Legislature and the Governor would not have limited the immunity conferred pursuant to this statute to services supporting the pandemic response if [they] actually intended for all medical providers to be immune from all liability short of gross negligence." *Skipper-Baines*, ___ Mich App at ___; slip op at 4. Second, under the PHCIA, the treatment provided must be "in support of this state's response to the COVID-19 pandemic," and, in accordance with *Skipper-Baines* and *Jokinen*, that means there must be a connection to COVID-19. Here the record reveals a tenuous-at-best treatment-connection to COVID-19. Rogers did not have COVID-19, and defendant did not treat him for it. His injury occurred when he was left unattended in the shower, and there is no evidence that the shower was mandated or required in response to the COVID-19 pandemic.

Defendant argues otherwise, contending Rogers desired to shower because he did not wish to bring COVID-19 home, but that fact is disputed because plaintiff asserts that he wished to shower after soiling himself earlier in the day. And even if true, there is no evidence or testimony that the hospital required or recommended he shower in response to the pandemic. Viewing that contested fact in a light most favorable to the nonmoving party, the reason Rogers wanted to shower was unrelated to COVID-19. And to be sure, Rogers was in a hospital unit that also treated patients with COVID-19, and defendant's transfer of a COVID-19 patient was the reason the nurse was not present when Rogers was in the shower. That is of no moment, however—his fall occurred when the assistant, not the nurse, left him unattended. Moreover, the assistant was not called away to assist a patient who had COVID-19; she left the shower room to retrieve an extra towel because the shower curtain did not adequately divert water from the floor. These facts are thus far afield from *Franklin*, where the plaintiff was infected with COVID-19 and developed ulcers as a result of the care he received for COVID-19.

Consequently, the trial court erred in granting immunity to defendant under the PHCIA. We reverse the trial court's grant of summary disposition to defendant on the basis of the PHCIA and remand to that court for further proceedings.

## III. GROSS NEGLIGENCE

Remaining is defendant's appeal concerning the trial court's denial of its motion for summary disposition on plaintiff's gross negligence claim. Although defendant faults the trial court for not dismissing those allegations under both MCR 2.116(C)(8) and (10), we focus here just on (C)(10). In our view, no reasonable juror could conclude McLaren engaged in gross negligence in its care of Rogers.

A motion for summary disposition premised on MCR 2.116(C)(10) tests the complaint's factual sufficiency. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 449; 980 NW2d 119 (2021). The moving party must identify the issues where no genuine issue of material fact exists. *Id*. The court must examine the "affidavits, pleadings, depositions, admissions, and other evidence" submitted with the motion, and must do so in a light most favorable to the nonmoving party. *Id*. (quotation marks and citation omitted). The opposing party may not rely on only allegations or denials, but must provide evidence with particular facts to demonstrate that a genuine issue exists for trial. *Id*.

Gross negligence denotes "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). That occurs, for example, if an objective observer watching the actor reasonably could conclude "that the actor simply did not care about the safety or welfare of those in his charge." *Id*. However, the plaintiff must establish beyond that the actor simply "could have done more," for "a claim can always be made that extra precautions could have influenced the result." *Id*. Importantly, "evidence of ordinary negligence does not create a material question of fact concerning gross negligence." *Maiden v Rozwood*, 461 Mich 109, 122-123; 597 NW2d 817 (1999). "Rather, a plaintiff must adduce proof of conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id*. at 123 (quotation marks and citation omitted). Questions regarding gross negligence are generally reserved for the jury, see *Dougherty v Detroit*, 340 Mich App 339, 345; 986 NW2d 467 (2021), but courts may resolve factual questions at the summary-disposition stage when reasonable minds could not disagree on the conclusion, *Briggs v Oakland Co*, 276 Mich App 369, 374; 742 NW2d 136 (2007).

No reasonable juror could conclude defendant displayed such apathy for Rogers as to rise to the level of gross negligence. Although plaintiff's complaint alleges that staff allowed decedent to shower "without any assistance or assistive devices whatsoever," the record demonstrates that to be false—it had assistive devices, including a chair and handrails. Crucially, the nurse assistant testified she was with decedent for most of his shower and left decedent in the shower only to retrieve additional towels because the floor was wetter than usual and instructed him not to move on his own. The parties do not dispute that decedent was capable of understanding and following instructions, and that Rogers fell when he disregarded those instructions and moved from the chair while the nursing assistant was gone for approximately 15 seconds. Perhaps the nursing assistant could have gathered sufficient towels before allowing decedent to take a shower, or waited until the nurse returned from transferring the patient with COVID-19 as plaintiff suggests, but

exercising additional precautions using hindsight is insufficient to rise to gross negligence. *Tarlea*, 263 Mich App at 90.

Nor are we persuaded that *Ray v Swager*, 321 Mich App 755 (2017) is germane as plaintiff suggests. There this Court found summary disposition inappropriate in a gross negligence action involving a high school cross-country coach's direction to his team to cross an intersection contrary to a red-handed pedestrian signal, with a vehicle ultimately striking and injuring one of his athletes. *Id*. at 759-761. That was so because numerous facts were in dispute concerning the circumstances of the accident, including the coach's instruction, whether the student heard the instruction or checked the intersection for himself, and how the driver entered the intersection. *Id*. But here there were no material factual disputes and, as explained, the record demonstrates the nurse assistant's conduct was not "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Maiden*, 461 Mich at 123.

## IV.  CONCLUSION

For these reasons, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Christopher M. Trebilcock